FILED
United States Court of Appeals
Tenth Circuit

November 23, 2022

Christopher M. Wolpert
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____

COURTHOUSE NEWS SERVICE,

    Plaintiff - Appellee,

v.

NEW MEXICO ADMINISTRATIVE
OFFICE OF THE COURTS; ARTHUR W.
PEPIN, Administrative Office Director;
NEW MEXICO FIRST JUDICIAL
DISTRICT COURT CLERK'S OFFICE;
KATHLEEN VIGIL, First Judicial Court
Clerk,

    Defendants - Appellants.

No. 21-2135

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:21-CV-00710-JB-LF)**

_____

Erin E. Lecocq, Assistant Attorney General (Nicholas M. Sydow, Solicitor General, with her on the briefs), Office of the New Mexico Attorney General, Santa Fe, New Mexico, appearing for Appellants.

Jonathan G. Fetterly, Bryan Cave Leighton Paisner LLP, San Francisco, California (Katherine Keating, Bryan Cave Leighton Paisner LLP, San Francisco, California, and Gregory P. Williams, Peifer, Hanson, Mullins & Baker, Albuquerque, New Mexico, with him on the brief), appearing for Appellee.

_____

Before **TYMKOVICH**, **BRISCOE**, and **PHILLIPS**, Circuit Judges.

_____

**BRISCOE**, Circuit Judge.

_____

The defendants (collectively, the "New Mexico Courts") appeal from the district court's entry of a preliminary injunction in favor of the plaintiff, Courthouse News Service ("Courthouse News"). In July 2021, Courthouse News moved for a preliminary injunction, arguing that it is likely to succeed on the merits of its claim that the New Mexico Courts' policy and practice of withholding new civil complaints from the press and public until after administrative processing—rather than providing the complaints contemporaneously upon receipt—violates Courthouse News' right of timely access to court filings under the First Amendment.

After conducting a hearing, the district court granted in part and denied in part Courthouse News' motion for a preliminary injunction. Specifically, the district court enjoined the New Mexico Courts from withholding press and public access to newly filed, non-confidential civil complaints for longer than five business hours. However, the district court concluded that Courthouse News is not entitled to a preliminary injunction that provides pre-processing, on-receipt, or immediate access to such complaints.

In this appeal, the New Mexico Courts argue that the district court erred in granting in part Courthouse News' motion for preliminary injunction. Exercising jurisdiction under 28 U.S.C. § 1292(a)(1), we affirm in part and reverse in part. Specifically, we affirm the district court's memorandum opinion and order to the extent that the district court (1) declined to abstain from hearing this case, and (2) concluded that the First Amendment right of access attaches when a complaint is

2

submitted to the court.  However, we conclude that the district court erred in imposing a bright-line, five-business-hour rule that fails to accommodate the state's interests in the administration of its courts.  Accordingly, we reverse the district court's entry of a preliminary injunction, vacate the preliminary injunction, and remand this case to the district court for further proceedings consistent with this opinion.

## I.     Background

### A.  Factual Background

#### 1.  *The Parties*

Courthouse News is a news service that reports on civil litigation in state and federal courts across the country.  Courthouse News has over 2,300 subscribers nationwide, including law firms and news outlets such as the Associated Press and the Wall Street Journal.

One of Courthouse News' publications—the "new litigation reports"—provide staff-written summaries of newly filed, noteworthy civil complaints.  The "new litigation reports" primarily cover civil complaints filed against businesses and public entities; they do not cover family law, probate, or criminal matters.  The new litigation report for New Mexico covers civil complaints filed in the United States District Court for the District of New Mexico and all the state district courts in New Mexico.

The focus of the present litigation is on timely access to newly filed, non-confidential civil complaints in the state district courts of New Mexico.  The

defendants, identified here as the New Mexico Courts, consist of the following offices and individuals: (1) the New Mexico Administrative Office of the Courts (the "NMAOC"); (2) Administrative Office Director Arthur W. Pepin; (3) the New Mexico First Judicial District Court Clerk's Office (the "Clerk's Office"); and (4) the First Judicial District Court Clerk Kathleen Vigil.

The NMAOC is a branch of the New Mexico court system that fulfills its purpose, in part, by "[e]nsuring that the courts have and use current technology" and "[d]eveloping and implementing improved court processes and supporting courts in their use." Aplt. App., Vol. III at 697–98. The Clerk's Office is "the processing center through which virtually all the court and case documents flow." Aplt. App., Vol. I at 14.

The courts of the State of New Mexico are divided into thirteen judicial districts, each comprised of one or more counties, as well as the Bernalillo County Metropolitan Court, the New Mexico Court of Appeals, and the New Mexico Supreme Court. The majority of New Mexico's population resides in the First, Second, and Third judicial districts. Each judicial district, except the Second District, has at least one district courthouse and one magistrate courthouse located in a city within that district.[1] Several judicial districts have more than one district and magistrate courthouse, which are usually located in each county. New Mexico's thirteen judicial districts contain a total of thirty-three counties.

---

[1] The Second Judicial District has a district courthouse and a metropolitan courthouse.

### 2. *New Mexico's Pre-2012 Paper-Filing System*

Before 2012, New Mexico's courts used a paper-filing system for court records. During this time, Courthouse News reporters would visit the courthouses in person to review newly filed paper complaints. Courthouse News has been reporting on civil complaints filed in New Mexico since 2005, when it began covering the United States District Court for the District of New Mexico and the state district courts in Santa Fe and Albuquerque. Courthouse News later expanded its coverage during the paper-filing era; until around 2011, Courthouse News reporters generally reviewed new civil complaints on the day they were filed in Bernalillo, Santa Fe, Sandoval, and Valencia counties.

Before electronic filing was available in the state courts of New Mexico, paper filing followed a two-step process. First, a filer would bring a paper pleading to the respective state courthouse during regular business hours, Monday through Friday, 8:00 a.m. to 5:00 p.m., and submit it to the court clerk. Second, the clerk would review the pleading for completeness and then either file it with a hand stamp or reject it on the spot. If the document was filed, a copy of that filing would be placed in a box in the clerk's office, where filed documents were available for review by the press during business hours.

Under this system, Courthouse News generally had same-day access to non-sealed, filed complaints. The court clerks usually took no more than a minute or two to review and file complaints. Although most complaints were placed in the press box on the same day—and usually within minutes—the district court found

5

that, "when complaints were filed towards the end of the business day, they would not be available to the press box until the following business day."[2]  Aplt. App., Vol. III at 775.

### 3. *New Mexico's Electronic Filing System*

The New Mexico Courts began implementing an electronic-filing system in 2012, and electronic filing became mandatory in 2014.  This electronic-filing system, Odyssey File and Serve ("Odyssey"), allows attorneys to electronically file their pleadings in New Mexico's state courts, twenty-four hours a day, seven days a week.  Attorneys in New Mexico are required to redact any protected personal identifier information ("PPII") contained in the pleadings, in accordance with New Mexico Rule of Civil Procedure 1-079.  N.M. Dist. Ct. R. Civ. P. 1-079(D)(1).

A document that is submitted by an attorney through the Odyssey system goes through five phases: (1) draft; (2) submitted; (3) under review; (4) processing; and (5) accepted/transmitted.  First, in the "draft" phase, a filer uploads the pleading documents and inputs the case type, the parties, and the location where the case is going to be filed.  Second, in the "submitted" phase, the filer hits the submit button, and the documents are then electronically sorted into queues where they await review by the court clerk.  Third, in the "under review" phase, the court clerk reviews the pleading documents and the data that was entered by the filer.  The court clerks

---

[2] Courthouse News challenges this finding and contends that reporters in the state courts of New Mexico "were traditionally able to see complaints [on the same day they were filed] until the courts stopped receiving complaints at the end of the day."  Aple. Br. at 11.

ensure that the filer selected the correct case type, and they also review each of the documents for completeness, legibility, required signatures, and confidential information. Fourth, in the "processing" phase, Odyssey populates the pleading documents with the case number, judge assignment, and case title. Fifth, in the "accepted/transmitted" phase, the case status changes to accepted, and the case is complete in Odyssey.[3]

Once a pleading has been "accepted," it is immediately available to the public through a website called "Secure Odyssey Public Access" ("SOPA"). Members of the press can apply for an account on SOPA, and SOPA access is free. The developer of SOPA, Tyler Technologies, provides different levels, or tiers, of access to court filings for different users. For example, members of the press can access "Tier One" files, which include the non-confidential civil cases at issue here. However, users with only "Tier One" access are restricted from viewing confidential documents, such as domestic violence or child abuse complaints.

## B. Procedural History

### 1. The Complaint

On July 30, 2021, Courthouse News filed a complaint against the New Mexico Courts in the United States District Court for the District of New Mexico. Specifically, Courthouse News alleges violations of (1) the First Amendment of the

---

[3] Instead of using the word "filed," the NMAOC distinguishes between when a document is "submitted," and when it is "transmitted" or "accepted." Aplt. App., Vol. II at 463–64.

United States Constitution, pursuant to 42 U.S.C. § 1983 (Count I); (2) federal

common law, pursuant to 42 U.S.C. § 1983 (Count II); and (3) Article 2, Section 17

of the New Mexico Constitution (Count III).  In Count I, Courthouse News seeks a

declaratory judgment and a preliminary and permanent injunction "to prevent further

deprivation of the First Amendment rights guaranteed to it and its subscribers."  Aplt.

App., Vol. I at 29.  In Counts II and III, Courthouse News seeks declaratory and

permanent injunctive relief.

### 2.  *Motion for Preliminary Injunction*

On July 30, 2021, Courthouse News filed a motion for preliminary injunction

against the New Mexico Courts, seeking to "prohibit[] them preliminarily . . . from

refusing to make newly-filed nonconfidential civil petitions available to the public

and press until after such petitions are processed or accepted, and further directing

them to make such petitions accessible to the press and public in a contemporaneous

manner upon receipt."  *Id*. at 33–34.  On September 28, 2021, the district court held a

hearing on the preliminary injunction motion.

### 3.  *The District Court's Memorandum Opinion and Order*

On October 8, 2021, the district court issued a memorandum opinion and order

granting in part and denying in part Courthouse News' motion for preliminary

injunction.  Specifically, the district court concluded that Courthouse News was

entitled to a preliminary injunction enjoining the New Mexico Courts from

withholding press or public access to newly filed, non-confidential civil complaints

for longer than five business hours, but not to a preliminary injunction that provides pre-processing, on-receipt, or immediate access to such complaints.

Upon review of the evidence and testimony offered at the hearing, the district court made detailed findings regarding the duration and frequency of delays in the New Mexico Courts' electronic-filing system. For example, between July 26, 2021, and August 25, 2021, 93.05% of initial civil filings in the state district courts were accepted within twenty-four hours, and 65.56% were accepted on the same date as submission. Aplt. App., Vol. III at 708–09. The district court also found that the New Mexico Courts' average processing time for initial filings was 8.82 hours, not taking into account whether the complaint was filed after hours. *Id.* at 778–79.

As an initial matter, the district court concluded that *Younger* abstention was not warranted, as this case failed to satisfy the doctrine's requirements. *See Younger v. Harris*, 401 U.S. 37 (1971). The district court reasoned that "Courthouse News' requested injunction would neither interfere with nor enjoin the substance or merits of any one particular state proceeding," but rather, "it would speed up press and public access to the documents—civil complaints in particular—through which all state proceedings happen." Aplt. App., Vol. III at 766.

The district court also concluded that *O'Shea* abstention was not warranted in this case. *See O'Shea v. Littleton*, 414 U.S. 488 (1974). The district court reasoned that, unlike the Supreme Court's concerns in *O'Shea*, here "there is little risk of an 'ongoing federal audit' or 'a major continuing intrusion of the equitable power of the

9

federal courts into the daily conduct of state . . . proceedings'" that would justify abstention. Aplt. App., Vol. III at 768 (quoting *O'Shea*, 414 U.S. at 500).

Turning to the merits, the district court first concluded that "Courthouse News has a qualified right of timely access" to newly filed, non-confidential civil complaints, "which attaches when a complaint is submitted." *Id.* at 771–72. Second, the district court "define[d] the outer limit of timely access" as "access provided within five business hours of filing a complaint." *Id.* at 776. Third, the district court determined that it would apply "relaxed" or "rigorous" scrutiny, rather than strict scrutiny, to assess whether the right of timely access had been violated. *Id.* at 777. Fourth (and finally), the district court concluded that, based on the evidence that both parties provided at the hearing, Courthouse News "is likely to succeed on the merits of its claim that [the New Mexico Courts] are violating Courthouse News' right of timely access to newly filed civil complaints, defined here as the right to access complaints within five business hours of their submission." *Id.* at 779. However, the district court also concluded that Courthouse News "has not shown that it will succeed on the merits of requiring immediate, pre-processing access to newly filed civil complaints." *Id.* at 783. Accordingly, the district court denied Courthouse News' request for an injunction requiring immediate, pre-processing access to civil complaints, but it granted Courthouse News' request for an injunction requiring

10

timely access to complaints, defined as access to complaints within five business hours of their submission.[4]

### 4. The New Mexico Courts' Notice of Appeal

On October 28, 2021, the New Mexico Courts timely filed a notice of appeal from the district court's memorandum opinion and order granting preliminary injunction in favor of Courthouse News.[5]

## II.    Standards of Review

## A. Abstention

A district court's decision on whether to abstain under the *Younger* doctrine is reviewed de novo. *Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC*, 953 F.3d 660, 669 (10th Cir. 2020). However, we have not determined the standard of review for the related doctrine of *O'Shea* abstention. *Cf. Courthouse News Serv. v. Planet* ("*Planet I*"), 750 F.3d 776, 782–83 (9th Cir. 2014) (noting that the standard of review

---

[4] On October 21, 2021, Courthouse News moved for partial reconsideration of the district court's order. Specifically, Courthouse News asked the district court to reconsider "the definition of 'the outer limit of timely access,' *i.e.*, 'access provided within five business hours of filing a complaint,'" and "the preliminary findings and conclusions that incorporate this definition." Aple. App., Vol. I at 15–16. Courthouse News argued that "the evidence in the record demonstrates that the press historically had access to new civil complaints on the day they were filed," and therefore "[a]llowing five business hours for access means most new civil complaints can be withheld until the day after filing, which does not reflect traditional access." *Id.* at 16. However, Courthouse News did not file a cross appeal and has since filed a notice to withdraw its motion for reconsideration without prejudice.

[5] On October 28, 2021, the New Mexico Courts moved to stay the preliminary injunction order pending appeal. However, the New Mexico Courts have filed a notice to withdraw their motion to stay without prejudice.

for a district court's decision to abstain under *O'Shea* is "unsettled" but determining that, regardless, the court "first review[s] *de novo* whether the legal requirements for abstention are satisfied.").[6]

## B. Preliminary Injunction

"District courts have discretion over whether to grant preliminary injunctions, and we will disturb their decisions only if they abuse that discretion." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 796 (10th Cir. 2019) (citations omitted). "A district court's decision crosses the abuse-of-discretion line if it rests on an erroneous legal conclusion or lacks a rational basis in the record." *Id.* In reviewing "a district court's decision to grant or deny a preliminary injunction, we thus examine the court's factual findings for clear error and its legal conclusions de novo." *Id.* at 796–97.

---

[6] The New Mexico Courts argue that we should review de novo the district court's abstention ruling considering the "related interests in play with *Younger* and *O'Shea* abstention, and the district court's intertwined analysis of the two doctrines." Aplt. Br. at 13–14. Courthouse News does not challenge, or even address, the New Mexico Courts' arguments regarding the proper standard of review that applies to *O'Shea* abstention.

Although the standard of review for a district court's decision on whether to abstain under *O'Shea* is unsettled, we need not resolve the issue. *See Planet I*, 750 F.3d at 782–83 (concluding that the court need not decide whether to apply de novo review or a modified abuse of discretion standard to questions of *O'Shea* abstention, because it would reverse the district court's decision under either standard). As discussed later in this opinion, *see infra* Section III.A.2, here the underlying legal requirements for *O'Shea* abstention have not been satisfied. The district court's rejection of *O'Shea* abstention, therefore, should be affirmed under either a de novo or a modified abuse of discretion standard.

### III.    Analysis

On appeal, the New Mexico Courts contend that the district court erred in granting the preliminary injunction in three respects.  First, the New Mexico Courts argue that the district court erred in declining to abstain from exercising its jurisdiction under the *O'Shea* doctrine, or, alternatively, the *Younger* doctrine.  Second, the New Mexico Courts assert that the district court erred in concluding that the First Amendment right of access attaches to documents before they have been processed and formally accepted by a court clerk.  Third, the New Mexico Courts maintain that the district court erred in imposing a bright-line, five-business-hour rule that fails to accommodate the state's interests in the administration of its courts.

We conclude that that the district court did not err in declining to abstain under *Younger* and *O'Shea*, and in determining that the right of access attaches when documents are first submitted to the court.  However, we agree with the New Mexico Courts that the district court erred in imposing a five-business-hour rule that fails to accommodate the state's interests in the administration of its courts.  Accordingly, we vacate the preliminary injunction and remand this case to the district court for further proceedings consistent with this opinion.

### A. Abstention

In their first issue on appeal, the New Mexico Courts argue that the district court should have abstained from exercising its jurisdiction under *O'Shea* because both the preliminary injunction and Courthouse News' requested relief require continuing federal oversight of state-court operations.  Alternatively, the New

13

Mexico Courts contend that, even if this court concludes that *O'Shea* abstention is not warranted, the *Younger* doctrine requires abstention because providing access to complaints before their review and acceptance would contravene New Mexico Supreme Court rules and orders. For the reasons explained below, we disagree.

Generally, "federal courts have a strict duty to exercise the jurisdiction that is conferred upon them by Congress." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996). Because of the "'virtually unflagging obligation of the federal courts to exercise the jurisdiction given them,' the Supreme Court has repeatedly cautioned that '[a]bstention from the exercise of federal jurisdiction is the exception, not the rule.'" *Elna Sefcovic, LLC*, 953 F.3d at 668 (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). The Supreme Court has, therefore, "carefully defined" the situations in which abstention by federal courts is appropriate. *New Orleans Public Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359 (1989).

Contrary to the New Mexico Courts' arguments, however, neither *Younger* nor *O'Shea* supports abstention here. We address each of the New Mexico Courts' abstention arguments in turn.

### 1. Younger *Abstention*

Under the *Younger* abstention doctrine, "federal courts should not 'interfere with state court proceedings by granting equitable relief—such as injunctions of important state proceedings or declaratory judgments regarding constitutional issues in those proceedings—' when a state forum provides an adequate avenue for relief."

*Weitzel v. Div. of Occupational & Prof'l Licensing*, 240 F.3d 871, 875 (10th Cir. 2001) (quoting *Rienhardt v. Kelly*, 164 F.3d 1296, 1302 (10th Cir. 1999)).  "*Younger* abstention is non-discretionary," and "the district court must abstain once the conditions are met, 'absent extraordinary circumstances.'"  *Id.* (quoting *Amanatullah v. Colo. Bd. of Med. Exam'rs*, 187 F.3d 1160, 1163 (10th Cir. 1999)).  For *Younger* abstention to apply, there must be: (1) "an ongoing state judicial . . . proceeding," (2) "the presence of an important state interest," and (3) "an adequate opportunity to raise federal claims in the state proceedings."  *Seneca-Cayuga Tribe of Okla. v. Okla. ex rel. Thompson*, 874 F.2d 709, 711 (10th Cir. 1989).

In *Sprint Communications, Inc. v. Jacobs*, the Supreme Court clarified that "*Younger* extends to . . . three 'exceptional circumstances' . . . but no further." 571 U.S. 69, 70 (2013).  Specifically, *Younger* applies to the following "three categories of state cases: (1) 'state criminal prosecutions,' (2) 'civil enforcement proceedings,' and (3) 'civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  *Elna Sefcovic, LLC*, 953 F.3d at 670 (quoting *Sprint Commc'ns*, 571 U.S. at 73).

As we have noted, *Younger*'s third category of cases is reserved for "civil proceedings implicating a [s]tate's interest in enforcing the orders and judgments of its courts such as state court contempt proceedings."  *Catanach v. Thomson*, 718 F. App'x 595, 597 n.2 (10th Cir. 2017); *see Courthouse News Serv. v. Schaeffer*, 429 F. Supp. 3d 196, 206–07 (E.D. Va. 2019) ("When the Supreme Court first identified that category of case justifying abstention, it was referring to civil contempt orders and

15

requirements for posting bond pending appeal." (citing *New Orleans Public Serv., Inc.*, 491 U.S. at 368)).  However, "*Younger* does not mechanically require abstention whenever a state court conducts contempt proceedings in a related matter," but "[r]ather . . . the 'exceptional circumstances' requiring abstention under *Younger*'s third category are present only when the relief requested from the federal court would enjoin or otherwise interfere with such proceedings." *Elna Sefcovic, LLC*, 953 F.3d at 672.

Here, we conclude that the district court did not err in declining to abstain under the *Younger* doctrine.  The Supreme Court has held that "[a]bsent any *pending* proceeding in state tribunals, . . . *Younger* abstention [is] clearly erroneous." *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992).  As Courthouse News correctly notes, there is no ongoing state proceeding with which the present case would interfere—the New Mexico Courts have conceded this point.  Aple. Br. at 15; Aplt. Br. at 29 (the New Mexico Courts noting that Courthouse News' "requested relief would not interfere with a specific civil proceeding").  Therefore, the first element of *Younger*, which requires an ongoing state proceeding, has not been met.

Not only does this case lack an ongoing state proceeding, it also lacks an ongoing state proceeding that falls within one of the three "exceptional" cases warranting *Younger* abstention.  The New Mexico Courts contend that *Younger* abstention is warranted because this case falls into the third category, which prevents federal courts from interfering with pending "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their

16

judicial functions." *Sprint Commc'ns*, 571 U.S. at 73. Specifically, the New Mexico

Courts maintain that this case "would interfere with the New Mexico Supreme

Court's orders concerning *all* non-confidential, civil proceedings and the [c]ourt's

supervisory power of the records and files from those proceedings." Aplt. Br. at 29.

According to the New Mexico Courts, these orders address the state courts'

responsibilities regarding the "maintenance of, privacy protection for, and access to

case files." *Id.* at 30. In the New Mexico Courts' view, "[t]he management of a

court's papers is essential to the court's performance of its judicial functions, and

therefore *Younger* precludes federal injunctions that impede the New Mexico

Supreme Court's orders that govern case files." *Id.* (internal quotation marks and

alteration omitted). However, the New Mexico Courts' sweeping concern that this

case would interfere with orders concerning all non-confidential, civil proceedings is

insufficient to come within the narrow scope of *Younger*'s third category.

Although *Younger*'s third category was intended to target "civil proceedings

implicating a [s]tate's interest in enforcing the orders and judgments of its courts

such as state court contempt proceedings," *Catanach*, 718 F. App'x at 597 n.2, the

injunction that Courthouse News seeks here would not inhibit a court from enforcing

its orders and judgments. While it is true that the New Mexico Supreme Court has

issued "orders" that govern the administration of case files, these are not the types of

"orders that are uniquely in furtherance of the state courts' ability to perform their

judicial functions" as contemplated by *Younger*'s third category of cases. *Sprint*

*Commc'ns*, 571 U.S. at 73. Courthouse News does not seek to challenge any orders

17

or judgments issued by a state court judge in pending litigation; instead, Courthouse News challenges access delays stemming from the functions of the administrative arm of the state courts.

Moreover, Courthouse News' requested relief would neither "enjoin [n]or otherwise interfere" with the substance of a single state proceeding, as required by *Younger*'s third category of cases. *Elna Sefcovic, LLC*, 953 F.3d at 672. Rather, Courthouse News seeks an injunction affecting the speed at which the public and the press can access civil complaints. This requested relief "target[s] only the clerical processing of complaints," which is "a ministerial, administrative function" rather than one that implicates the state court's ability to perform its core judicial functions. *Courthouse News Serv. v. Forman*, No. 4:22CV106-MW/MAF, 2022 WL 1405907, at *10 (N.D. Fla. May 4, 2022).

Accordingly, we conclude that the requirements of the *Younger* doctrine are not satisfied, and the district court did not err in declining to abstain under *Younger*.

### 2.  O'Shea *Abstention*

We now turn our attention to the New Mexico Courts' arguments in favor of *O'Shea* abstention. In *O'Shea*, the plaintiffs alleged that the county magistrate and judge engaged in racially discriminatory practices in the administration of justice, such as setting higher bail for and imposing harsher sentences on black defendants than white defendants. *O'Shea*, 414 U.S. at 492–93. The Supreme Court concluded that principles of equity, comity, and federalism "preclude[d] equitable intervention" because the plaintiffs sought "an injunction aimed at controlling or preventing the

18

occurrence of specific events that might take place in the course of future state criminal trials." *Id.* at 499–500.

In *O'Shea*, the Supreme Court relied upon its decision in *Younger*, which "had established a firm rule against enjoining ongoing state criminal proceedings, absent exceptional circumstances." *Planet I*, 750 F.3d at 789. Because the requested relief in *O'Shea* "would contemplate interruption of state proceedings to adjudicate assertions of noncompliance" on the part of the judicial officers, the Supreme Court reasoned that the plaintiffs sought to "indirectly accomplish the kind of interference that [*Younger*] . . . sought to prevent" through an "ongoing federal audit of state criminal proceedings." *O'Shea*, 414 U.S. at 500.

The Supreme Court also observed in *O'Shea* that subsequent enforcement of the injunction "would require . . . the continuous supervision by the federal court over the conduct of" the state judicial officers "in the course of future criminal trial proceedings." *Id.* at 501. Although the Seventh Circuit "did not attempt to specify exactly what type of injunctive relief might be justified" to prevent the discrimination alleged by the plaintiffs, "it at least suggested that it might include a requirement of 'periodic reports of various types of aggregate data on actions on bail and sentencing.'" *Id.* at 493 n.1 (quoting *Littleton v. Berbling*, 468 F.2d 389, 415 (7th Cir. 1972), *rev'd sub nom. O'Shea*, 414 U.S. 488, and *vacated sub nom. Spomer v. Littleton*, 414 U.S. 514 (1974)). In the Supreme Court's view, even though the Seventh Circuit had specifically "disclaimed any intention of requiring the [d]istrict [c]ourt to sit in constant day-to-day supervision of [the state] judicial officers," the

19

periodic reporting system considered by the Seventh Circuit "would constitute a form of monitoring of the operation of state court functions that is antipathetic to established principles of comity." *Id.* at 501.

Here, the New Mexico Courts argue that *O'Shea* abstention is warranted because Courthouse News' requested relief and the preliminary injunction entail continued federal oversight of state court operations. In support of this argument, the New Mexico Courts raise two central points. First, the New Mexico Courts contend that *O'Shea* requires abstention where the requested relief would involve the continuing federal oversight of state court *operations*, even outside the context of specific state court *proceedings*. Second, the New Mexico Courts claim that both the preliminary injunction and Courthouse News' requested relief require an ongoing interference with state court operations that warrants *O'Shea* abstention. We disagree.

### a. O'Shea *Abstention Does Not Apply to Cases Involving "State Court Operations" in the Absence of State Court Proceedings*

As an initial matter, we reject the New Mexico Courts' assertion that *O'Shea* requires abstention where a case would interfere with "state court operations" divorced from any specific state court proceedings. The New Mexico Courts cite our opinion in *Joseph A. ex rel. Corrine Wolfe v. Ingram*, 275 F.3d 1253 (10th Cir. 2002), to support their position: "The reasoning of *O'Shea* and its progeny suggests that federal court oversight of state court operations, even if not framed as [a] direct review of state court judgments, may nevertheless be problematic for *Younger*

20

purposes." *Id.* at 1271. However, our use of the word "operations" in *Joseph A.* did not broadly expand *O'Shea* to encompass cases involving "state court operations" in the absence of any current or future state court proceedings. Our statement in *Joseph A.* must be read in context.

In *Joseph A.*, we concluded that abstention was warranted under *Younger* and *O'Shea* to prevent federal interference with underlying state court proceedings in the New Mexico Children's Court. In *Joseph A.*, the plaintiffs sought enforcement of a consent decree that would have "expressly prevent[ed]" the New Mexico Department of Human Services "from recommending a range of planning options" to the New Mexico Children's Court for children who are in the department's custody. *Id.* at 1268. We observed that the consent decree's "limitation [had] an effect not unlike that of an injunction or declaratory judgment because the [d]epartment [was] precluded *ever* from presenting certain options to the Children's Court," *id.* at 1268–69 (emphasis added), and that "federal enforcement of some of the [settlement] provisions would significantly interfere with state court proceedings," *id.* at 1267. In sum, we reasoned that "[t]he relevant case law supports abstention where, as here, federal court oversight of *state court proceedings* is required." *Id.* at 1272 (emphasis added). Our decision in *Joseph A.*, therefore, does not support the New Mexico Courts' assertion that *O'Shea* abstention is appropriate in the absence of any current or future state court proceedings.[7]

---

[7] The New Mexico Courts' citation to our decision in *Phelps v. Hamilton*, 122 F.3d 1309 (10th Cir. 1997), also fails to demonstrate that *O'Shea* extends to cases

The New Mexico Courts also point to the Seventh Circuit's decision in

*Courthouse News Service v. Brown*, 908 F.3d 1063 (7th Cir. 2018), as support for its

position that *O'Shea* extends to cases involving state court *operations* divorced from

any current or future state court *proceedings*.  In *Brown*, the Seventh Circuit

concluded that abstention was warranted where Courthouse News filed a similar suit

challenging state court delays in providing access to civil complaints.  *Id.* at 1071.

The Seventh Circuit acknowledged that none of the "principal categories of

abstention" constituted "a perfect fit," yet it still determined that abstention was

warranted based "on the more general principles of federalism."  *Id.* at 1071.

---

involving state court operations in the absence of any current or future state court
proceedings.  In *Phelps*, we abstained under *O'Shea* where the plaintiffs asked the
federal courts "to monitor the local district attorney's office to [e]nsure that they
[were] not prosecuted under valid state laws" for any incidents "related to their
alleged protected speech and activity."  *Id.* at 1317.  There, we reasoned that the
plaintiffs sought "an injunction aimed at controlling or preventing the occurrence of
specific events that might take place in the course of future criminal [proceedings]."
*Id.* (quoting *O'Shea*, 414 U.S. at 500).  Just as in *O'Shea*, the relief sought in *Phelps*
would have altered the operations of the state court in future proceedings before it.

Similarly, the other cases cited by the New Mexico Courts fail to support their
expansive view of *O'Shea* abstention.  *See* Aplt. Br. at 17–18, 22–23; Aplt. Reply Br.
at 9–11.  Although each of their cited cases involved a request for relief that would
have interfered with state court operations, this interference would have occurred
within the context of current or future state court proceedings.  *See, e.g.*, *Disability
Rts. N.Y. v. New York*, 916 F.3d 129 (2d Cir. 2019) (affirming *Younger* and *O'Shea*
abstention where the requested relief sought to control or prevent "the occurrence of
specific events" in "future state [guardianship proceedings]" in New York
Surrogate's Court); *Miles v. Wesley*, 801 F.3d 1060 (9th Cir. 2015) (affirming *O'Shea*
abstention where the requested relief would constitute "federal interference in a state
court system's determination of where, when, and how different types of cases should
be heard").

While federalism concerns are not without force, we agree with the approach of our other sister circuits that have rejected the exercise of *O'Shea* abstention in similar challenges brought by Courthouse News, as this approach conforms more closely with Supreme Court guidance and the prior precedent of this court.  *See Courthouse News Serv. v. Gilmer*, 48 F.4th 908, 914 (8th Cir. 2022) (reversing the district court's exercise of *O'Shea* abstention, and noting that a well-tailored injunction would pose "no risk that a decision in Courthouse News's favor would interrupt any state-court proceeding, despite the significant administrative burden it might place on court staff"); *Planet I*, 750 F.3d at 790 (reversing the district court's exercise of *O'Shea* abstention, and concluding that "*O'Shea* abstention is inappropriate where the requested relief may be achieved without an ongoing intrusion into the state's administration of justice, but is appropriate where the relief sought would require the federal court to monitor the substance of individual cases on an ongoing basis to administer its judgment").

> b. *The Preliminary Injunction and Requested Relief Would Not Constitute an Ongoing Interference with State Court Operations that Warrants* O'Shea *Abstention*

Next, we turn to the New Mexico Courts' assertion that the preliminary injunction and Courthouse News' requested relief would constitute an ongoing interference with state court operations that warrants *O'Shea* abstention.  The preliminary injunction that was entered by the district court in this case requires the New Mexico Courts to provide access to civil complaints within five business hours of a complaint's submission.  Additionally, Courthouse News seeks a permanent

23

injunction prohibiting the New Mexico Courts "from denying Courthouse News access to new civil court, case-initiating complaints until after administrative processing." Aplt. App., Vol. I at 31. Finally, Courthouse News seeks a declaratory judgment "declaring the denial of access to new civil court, case-initiating complaints until after administrative processing as unconstitutional . . . for the reason that it constitutes an effective denial of timely access to court records." *Id.* Contrary to the New Mexico Courts' assertions, we conclude that neither the preliminary injunction nor Courthouse News' requested relief justify the exercise of *O'Shea* abstention.

In *Planet I*, the Ninth Circuit expressly rejected the application of *O'Shea* abstention in a similar case involving Courthouse News' challenge to the timing of public access to civil complaints. There, Courthouse News sought preliminary and permanent injunctive relief, as well as declaratory judgment, to ensure "timely access to new civil unlimited jurisdiction complaints on the same day they are filed." *Planet I*, 750 F.3d at 790–91. The Ninth Circuit concluded that Courthouse News' requested relief "pose[d] little risk of an 'ongoing federal audit' or 'a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state . . . proceedings.'" *Id.* at 792 (quoting *O'Shea*, 414 U.S. at 500). Specifically, the Ninth Circuit reasoned that, to determine whether a state court is making complaints available on the day they are filed, "a federal court would not need to engage in [an] intensive, context-specific legal inquiry[,]" and "[t]here is little risk that the federal courts would need to 'examin[e] the administration of a

substantial number of individual cases' to provide the requested relief." *Id.* at 791

(quoting *E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1124 (9th Cir. 2012)).

Here, too, both the preliminary injunction and Courthouse News' requested

relief are "more akin to [a] bright-line finding . . . than the ongoing monitoring of the

substance of state proceedings" that would warrant the exercise of *O'Shea* abstention.

*Id.* Because these remedies "target only the clerical processing of complaints,"

*Forman*, 2022 WL 1405907, at *10, divorced from any state court proceedings, a

federal court would not be required to monitor the substance of individual cases on

an ongoing basis to provide the relief that Courthouse News seeks. *See Planet I*, 750

F.3d at 791.

Moreover, the New Mexico Courts have "available a variety of simple

measures to comply with an injunction" granting Courthouse News all or part of its

requested relief, should Courthouse News ultimately prevail on the merits of its

claims. *Id.* As the Ninth Circuit observed in *Planet I*, various state and federal

courts across the country have successfully implemented procedures to provide

reporters with same-day access.[8] *Id.* Here, the district court has not mandated that

---

[8] The Ninth Circuit noted the following examples of measures implemented by federal and state courts to ensure same-day access: (1) "giv[ing] reporters a key to a room where new complaints are placed in boxes for review before being processed" (the Los Angeles Division of the United States District Court for the Central District of California); (2) "plac[ing] paper versions of new complaints in a secure area behind the counter where reporters are free to review them on the day of filing" (the New York County Supreme Court in Manhattan); and (3) "permit[ting] reporters to view the cover page of all newly filed complaints each afternoon and request the full text of any that seem newsworthy" (the Santa Monica branch of the Superior Court for Los Angeles County). *Planet I*, 750 F.3d at 791.

the New Mexico Courts follow a specific protocol to "make non-confidential civil complaints available to the press more consistently in a contemporaneous manner." Aplt. App., Vol. III at 785. Rather, the district court clarified that the New Mexico Courts "remain[] free to decide how to speed up that process." *Id.* The fact that the New Mexico Courts have the flexibility to select a less restrictive, alternative means of access therefore undermines their argument that an injunction would result in continuing federal court supervision of their operations.

The New Mexico Courts also express concern that the preliminary injunction and requested relief will subject the state courts to the threat of future claims based on violations of the federal court's injunction. However, the fact "that *some* additional litigation may later arise to enforce an injunction does not itself justify abstaining from deciding a constitutional claim." *Planet I*, 750 F.3d at 792 (noting that if *O'Shea* abstention were to apply every time litigants seek federal court injunctions to reform the institutions of state government, this "would justify abstention as a matter of course in almost any civil rights action under § 1983"). Moreover, we "also trust that the [New Mexico Courts] would comply with any federal injunction requiring it to make . . . civil complaints available within a specified time period, so further proceedings to enforce an injunction would be unlikely." *Id.*

Additionally, the New Mexico Courts argue that Courthouse News' requested relief of access to complaints before they have been reviewed and accepted by court clerks "would contravene New Mexico Supreme Court rules and orders defining

26

pleadings and restricting access to confidential records." Aplt. Br. at 25. However, neither of these propositions justifies the exercise of *O'Shea* abstention here.

First, the New Mexico Courts assert that Courthouse News' proposed injunction "effectively would redefine what constitutes a court record subject to public access." *Id.* at 26. Specifically, the New Mexico Courts point to the following provisions: (1) the New Mexico Supreme Court rules that "provide that documents submitted for electronic filing may be rejected or placed in an error queue," *id.* at 27 (citing N.M. Dist. Ct. R. Civ. P. 1-005.2(G) and N.M. R. App. P. 12-307.2(F)); and (2) a New Mexico Supreme Court order that provides press access to "currently digitized court case files," *id.* at 26–27 (citing Aplt. App., Vol. II at 353 (N.M. Sup. Ct. Order No. 17-8500-001, at 1–2 (Feb. 20, 2017))). According to the New Mexico Courts, Courthouse News' proposed injunction would contradict the New Mexico Supreme Court's access policy for online court records "by creating a right of access to complaints . . . before they have been accepted and regardless of whether they are rejected or placed in a [review] queue." *Id.*

This argument is unavailing. As an initial matter, and as explained later in the following section of this opinion, the First Amendment right of access attaches to complaints when the court *receives* them, regardless of the technical terms and clerical processes used by the court. *See infra* Section III.B.2. Should Courthouse News ultimately prevail on the merits of its claims and receive an injunction granting all or part of its requested relief, such an injunction would not "redefine what constitutes a court record subject to public access," Aplt. Br. at 26, but rather, it

27

would prohibit an unconstitutional practice.  Moreover, none of the orders or rules cited by the New Mexico Courts require court clerks to review and accept complaints prior to making them available to the press or public, or otherwise preclude faster access to these complaints.  For example, although New Mexico Supreme Court Order No. 17-8500-001 provides the press with online access to "currently digitized court case files," it does not address *when* new electronically filed civil complaints should be made accessible to the press or the public, nor does it require that the clerks complete administrative processing before making such complaints accessible to the press or the public.

Second, the New Mexico Courts contend that the requested relief "would forestall state court clerks from reviewing complaints for confidential information or exhibits before they are approved for filing and released for public access."  Aplt. Br. at 27.  The New Mexico Courts first point to New Mexico Rule of Civil Procedure 1-079(C), which provides that all court records in certain categories of cases—for example, abuse and neglect cases—"are confidential and shall be automatically sealed without motion or order of the court."  N.M. Dist. Ct. R. Civ. P. 1-079(C).  Next, the New Mexico Courts note that Rule 1-079(D)(1) provides that "[PPII] shall not be made available on publicly accessible court websites."  N.M. Dist. Ct. R. Civ. P. 1-079(D)(1).  Although court clerks are "not required to review documents for compliance with [Rule 1-079(D)(1)]" or "to screen court records released to the public to prevent disclosure of [PPII]," N.M. Dist. Ct. R. Civ. P. 1-079(D)(2), the

28

New Mexico Courts contend that clerks still attempt to screen filings for PPII and reject such documents before they are placed on a publicly-accessible court website.

Here, too, the rules cited by the New Mexico Courts do not support their claim that the requested relief would contravene rules and orders restricting access to confidential records. As Courthouse News correctly notes, the types of cases that are automatically sealed pursuant to Rule 1-079(C), such as criminal, family, and mental health proceedings, are excluded from those that can be electronically filed with the New Mexico Courts. *See* N.M. Dist. Ct. R. Civ. P. 1-005.2(A) (defining "EFS" as "the electronic filing system" for use in "civil actions"); N.M. Dist. Ct. R. Civ. P. 1-005.2(B) ("'civil actions' does not include . . . actions sealed under Rule 1-079"). Because documents in those types of cases are filed in paper form rather than electronically, court clerks could easily segregate those documents from the non-confidential civil complaints at issue.[9] Additionally, Rule 1-079(D)(1) neither

---

[9] The New Mexico Courts contend that filers can still submit such automatically sealed complaints electronically, and they cite to one instance where an attorney allegedly violated court rules by *intentionally* filing a sealed record electronically. Aplt. Br. at 28 (citing Aplt. App., Vol. II at 575–77). However, this situation appears to be a rare outlier, as attorneys are generally vigilant about filing motions to seal to protect confidential client information. Moreover, numerous courts across the country utilize electronic filing systems and still receive documents that require confidential handling. Similarly, the New Mexico Courts can implement safeguards to securely receive and protect confidential filings through their electronic filing system. *See* Aplt. App., Vol. II at 419–20 (testimony regarding Tyler Technologies' case-type filter, or an e-file manager that allows the filer to choose whether the case is public or non-public, and then diverts the non-public cases away from the press queue); *id.* at 415–18 (testimony regarding non-disclosure agreements that reporters must sign to access SOPA, pursuant to which their access can be withdrawn if they disclose PPII or other confidential or sealed information).

precludes faster access to newly filed, non-confidential civil complaints, nor requires court clerks to review and accept the complaints prior to making them available to the press or public. Indeed, the New Mexico Courts concede that, pursuant to Rule 1-079(D)(2), court clerks are not required to review documents or screen court records released to the public to prevent disclosure of PPII. *See* Aplt. Br. at 28.

For these reasons, we conclude that *O'Shea* abstention is not warranted in this case and the district court did not err in declining to abstain under *O'Shea*.

**B. First Amendment Right of Access**

Next, we turn to the merits of this case. As an initial matter, the New Mexico Courts do not dispute that the press and the public have a First Amendment right of access to non-confidential, civil complaints. In their second issue on appeal, however, the New Mexico Courts argue that the district court erred in concluding that the right of access attaches to these complaints when they are filed with the courts, and before they have been processed and accepted by court clerks.

Here, we must first determine whether the First Amendment right of access applies to the type of judicial records at issue, and if so, at what moment in time this right attaches. For the reasons explained below, we conclude that the press and the public have a First Amendment right of access to newly filed, non-confidential civil complaints, and that this right attaches when a complaint is filed with, or submitted to, the courts.

### 1. The Right of Access Applies to Newly Filed, Non-Confidential Civil Complaints

Although "the First Amendment does not explicitly mention a right of access to court proceedings and documents, 'the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents.'" *Brown*, 908 F.3d at 1068–69 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978)). The First Amendment right of access to court documents can be traced back to *Richmond Newspapers, Inc. v. Virginia*, in which the Supreme Court held that the First Amendment protects access to criminal trials. 448 U.S. 555, 576–78 (1980) (plurality opinion). Thereafter, a full majority of the Supreme Court affirmed the First Amendment right of access to criminal trials in *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 603–04 (1982).

"The Supreme Court has yet to explicitly rule on whether the First Amendment right of access to information reaches civil judicial proceedings and records, but the federal courts of appeals widely agree that it does." *Courthouse News Serv. v. Planet* ("*Planet III*"), 947 F.3d 581, 590 (9th Cir. 2020); *see Planet I*, 750 F.3d at 786 (collecting cases); *Courthouse News Serv. v. Schaefer*, 2 F.4th 318, 328 (4th Cir. 2021); *Brown*, 908 F.3d at 1069. This consensus among the circuit courts comports with the Supreme Court's guidance, as it has cautioned against "any 'narrow, literal conception' of the [First] Amendment's terms." *Globe Newspaper Co.*, 457 U.S. at 604 (quoting *NAACP v. Button*, 371 U.S. 415, 430 (1963)). As the Supreme Court explained,

31

> [T]he Framers were concerned with broad principles, and wrote against a background of shared values and practices. The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights.

*Id.*

In *Press-Enter. Co. v. Superior Ct.* ("*Press-Enterprise II*"), 478 U.S. 1, 8–9 (1986), the Supreme Court formulated a two-part test for First Amendment right of access claims. Pursuant to the first step of the *Press-Enterprise II* analytical framework, we must determine whether a right of access attaches to a particular type of judicial proceeding or record. *Id.* To do so, we consider whether the following "considerations of experience and logic" are met: (1) under the "experience" prong, a judicial proceeding or record must "have historically been open to the press and general public," and (2) under the "logic" prong, public access must play a "significant positive role in the functioning of the particular process in question." *Id.* These considerations, taken together, are known as the "experience and logic" test.

If the "experience and logic" test is satisfied, a presumptive First Amendment right of access arises. *Planet III*, 947 F.3d at 590. However, "[t]he right to inspect and copy judicial records is not absolute"—it is qualified. *Nixon*, 435 U.S. at 598. Once this qualified right of access has been established, therefore, the court proceeds to the second step of the *Press-Enterprise II* framework to determine whether the restrictions on access satisfy constitutional scrutiny. *See Press-Enterprise II*, 478 U.S. at 9. The second step of the *Press-Enterprise II* framework involves a balancing test that weighs the qualified right of access against the interests asserted by the party

32

seeking to restrict access.  In the context of this case, the *Press-Enterprise II* balancing test aims to reconcile the press and the public's interest in accessing court documents in a timely manner with the state's interest in the orderly administration of its courts.  *Id.*; *see also Planet III*, 947 F.3d at 596.  We will discuss the *Press-Enterprise II* balancing test in more detail in the following section of this opinion.  *See infra* Section III.C.

Here, we join our sister circuits in concluding that "the press and public enjoy a First Amendment right of access to newly filed civil complaints."  *Schaefer*, 2 F.4th at 328; *see also Planet III*, 947 F.3d at 591; *Brown*, 908 F.3d at 1069.  As an initial matter, "[b]oth our common experience and the logical extension of First Amendment principles lead to the conclusion that 'the press's right of access to civil proceedings and documents fits squarely within the First Amendment's protections,'" *Planet III*, 947 F.3d at 591 (quoting *Brown*, 908 F.3d at 1069).  The Supreme Court has observed that "a major purpose of th[e] [First] Amendment was to protect the free discussion of governmental affairs."  *Globe Newspaper Co.*, 457 U.S. at 604 (internal quotation marks omitted).  "The right of access is thus an essential part of the First Amendment's purpose to 'ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government.'" *Planet III*, 947 F.3d at 785 (quoting *Globe Newspaper Co.*, 457 U.S. at 604).

Moreover, we conclude that both prongs of *Press-Enterprise II*'s "experience and logic" test are satisfied here.  As to the experience prong, "[t]here is no dispute that, historically, courts have openly provided the press and general public with

access to civil complaints." *Schaefer*, 2 F.4th at 326 (quoting *Courthouse News Serv. v. Schaefer*, 440 F. Supp. 3d 532, 557 (E.D. Va. 2020)). We therefore agree with the other federal courts that have acknowledged this "nationwide tradition and practice of access to newly filed civil complaints." *Id.* And, in this case, the district court noted that it "heard testimony from witnesses for both Courthouse News and the [New Mexico Courts] that, before the advent of e-filing, reporters accessed newly filed complaints after they had been filed with the clerk of the court." Aplt. App., Vol. III at 770. Indeed, the New Mexico Courts do not challenge that the experience prong supports the public right of access to civil complaints; rather, they simply challenge at what point in time this right of access attaches. Accordingly, we conclude that the experience prong of *Press-Enterprise II* supports a finding of a public right of access to civil complaints.

As to the logic prong, "we have no trouble concluding that public access to complaints logically plays a positive role in the functioning of the judicial process." *Schaefer*, 2 F.4th at 327. The Supreme Court has explained that "public inclusion" in the judicial system, especially through the press's reporting, "affords citizens a form of legal education and hopefully promotes confidence in the fair administration of justice." *Richmond Newspapers, Inc.*, 448 U.S. at 572, 572 (1980) (plurality opinion) (quoting *State v. Schmit*, 139 N.W.2d 800, 807 (Minn. 1966)). Access to the judicial system also allows the public to "participate in and serve as a check upon the judicial process—an essential component in our structure of self-government." *Globe Newspaper Co.*, 457 U.S. at 606. However, "[i]t would be impossible for the public

34

to perform this role adequately without access to nonconfidential civil complaints." *Schaefer*, 2 F.4th at 327. "A complaint, which initiates judicial proceedings, is the cornerstone of every case, the very architecture of the lawsuit, and access to the complaint is almost always necessary if the public is to understand a court's decision." *Fed. Trade Comm'n v. Abbvie Prods. LLC*, 713 F.3d 54, 62 (11th Cir. 2013). "Because [complaints] allow the public to understand the parties involved in a case, the facts alleged, the issues for trial, and the relief sought," providing public access to complaints . . . is crucial to 'not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary.'" *Schaefer*, 2 F.4th at 327 (quoting *Doe v. Pub. Citizen*, 749 F.3d 246, 266 (4th Cir. 2014)). We therefore conclude that the logic prong of *Press-Enterprise II* also supports a finding of a public right of access to civil complaints.

In sum, we conclude that the First Amendment's right of access to court proceedings and documents extends to newly filed civil complaints.

### 2. *The Right of Access Attaches When the Complaint is Filed*

Having concluded that the First Amendment right of access applies to judicial records at issue in this case, next we turn to the related issue of when this right attaches.

If a First Amendment right of access exists, it carries an associated "right to timely access." *Planet III*, 947 F.3d at 594 (noting that "a necessary corollary of the right to access is a right to timely access"). "[R]eporting on complaints must be

timely to be newsworthy and to allow for ample and meaningful public discussion regarding the functioning of our nation's court systems." *Id.*

The Ninth Circuit has concluded that the qualified right of timely access "attaches when the complaint is filed." *Id.* at 585. Several district courts, in addition to the district court in this case, have also arrived at the same conclusion. *See, e.g.,* *Courthouse News Serv. v. Cozine*, No. 3:21-CV-00680-YY, 2022 WL 593603, at \*5– 7 (D. Or. Feb. 14, 2022), *report and recommendation adopted*, No. 3:21-CV-680- YY, 2022 WL 1000775 (D. Or. Apr. 4, 2022) (denying summary judgment premised on argument that the First Amendment right does not attach until complaint is "accepted"); *Courthouse News Serv. v. Gabel*, No. 2:21-CV-000132, 2021 WL 5416650, at \*13 (D. Vt. Nov. 19, 2021) ("A qualified First Amendment right of access attaches when a complaint is electronically filed.").

Here, we conclude that the district court did not err in concluding that a First Amendment right to access civil complaints attaches when the complaint is filed (or submitted) to the court. As an initial matter, the New Mexico Courts have not cited to any case that supports the proposition that the right of access attaches at the point of acceptance, nor are we aware of any such case. Rather, the district court in this case appears to have agreed with every other court that has addressed this issue. *See, e.g., Planet III*, 947 F.3d at 585; *Cozine*, 2022 WL 1000775, at \*1–2; *Gabel*, 2021 WL 5416650, at \*13.

Instead, the New Mexico Courts argue that "both experience and logic dictate that a right of access does not attach to documents that have not yet become court

36

records." Aplt. Br. at 31.  Contrary to the New Mexico Courts' assertions, however, we conclude that both the experience and logic prongs of *Press-Enterprise II* support the district court's conclusion that the right of access attaches when a complaint is submitted to the court.

### a. "Experience" Prong

As to the experience prong of *Press-Enterprise II*, the New Mexico Courts contend that "New Mexico's press access before e-filing demonstrates that public access historically occurred after a document was accepted by the clerk," and "New Mexico's current e-filing system provides access to court records at the same post-acceptance stage historical practice afforded." *Id.* at 32.  Additionally, the New Mexico Courts assert that "[b]ecause a document can be modified, rejected, sealed, or amended in other ways between receipt and acceptance, the document is not an official court record until it is 'accepted' by the clerk." *Id.* at 33.

The New Mexico Courts' arguments regarding historical access lack merit.  To begin, the New Mexico Courts disingenuously focus on the technical terms applied to various intake and docketing tasks, rather than the delay that such tasks may cause—even though these delays lie at the heart of Courthouse News' constitutional challenge.  The parties do not dispute that, under the prior paper-filing system, the press generally had access to new complaints filed in New Mexico *after* they crossed the clerk's intake counter.  *See* Aplt. Br. at 32; Aple. Br. at 39.  However, the New Mexico Courts overlook the fact that clerks generally completed the initial intake process within a couple minutes.  *See* Aplt. App., Vol. II at 434–36 (noting that court

37

clerks performed their initial review of a complaint within "a minute to two minutes at most"). As a result, the press "essentially had same-day access to non-sealed, filed case records." *Id.* at 342; *see also* Aplt. App., Vol. I at 169–71.

Although the New Mexico Courts correctly note that the press previously had access to complaints only after the clerks completed their initial review, the similarities between traditional access and current access end there. The New Mexico Courts' current electronic-filing system results in delays that differ meaningfully from the timely access that the press enjoyed under New Mexico's paper-filing system. *See* Aplt. App., Vol. I at 171–73 (declaration from Courthouse News reporter, Victoria Prieskop, asserting that after New Mexico switched over to electronic filing, she could "only see the cases after they [were] processed by the clerk," which usually occurred "on a delayed basis, a day or two after they were filed"); Aplt. App., Vol. II at 436–37 (testimony from the publisher of Courthouse News, William Girdner, asserting that he could only see complaints once "the docketing process [was] done" and the document became "available on SOPA," which was sometimes delayed "as long as three days or more"). Therefore, the fact that the press historically saw new civil complaints *after* the clerk's initial intake process was complete—which typically took no more than a minute or two—cannot be used to justify the delayed access under the New Mexico Courts' present-day procedures.

In support of their argument, the New Mexico Courts present a flawed analogy, equating an electronically filed complaint in the court's digital queue with a

paper complaint in the hands of a filer standing in line at the clerk's window. *See* Aplt. Br. at 32–33 (arguing that "Courthouse News is essentially requesting access to a pleading while the filer is standing in line, prior to clerical administrative review"). However, these two moments in time are not analogous. While filers waiting in line at the clerk's window have not yet submitted their paper complaints to the court, electronic complaints waiting in the digital queue have already been submitted by the filer and received by the court. As the Director of the NMAOC described, the submission of a complaint under the electronic filing system occurs "when the magic of the electronics brings that document . . . to the court," as this is "the moment when [a clerk] could begin to look at it." Aplt. App., Vol. II at 510. This critical moment in time—regardless of whether a filer hands a paper complaint to an intake clerk, or whether a filer hits the 'submit' button on the electronic-filing software—is when the First Amendment right of access attaches.

Finally, the New Mexico Courts' argument that a document is not an official court record until it is accepted by the clerk, "[b]ecause a document can be modified, rejected, sealed, or amended in other ways between receipt and acceptance," is unpersuasive. Aplt. Br. at 33 (citing to N.M. Dist. Ct. R. Civ. P. 1-005.2(G) and N.M. R. App. P. 12-307.2(F) regarding the potential rejection of filings by clerks). "[T]he labels and terminology a state court employs to identify different parts of the filing process cannot have a determinative effect on *when* the First Amendment right of access attaches." *Cozine*, 2022 WL 593603, at \*7. Otherwise, "court administrators could potentially . . . abrogate the media's First Amendment right of

access . . . by adopting administrative rules that define a document as 'filed' much later in the judicial review process." *Id.*; *see Washington-S. Nav. Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629, 635–36 (1924) (noting that although "[t]he function of rules is to regulate the practice of the court and to facilitate the transaction of its business," "no rule of court can . . . . abrogate or modify the substantive law.").

Granted, the fact that the right of access attaches to complaints when they are submitted to the court does not mean that the press is entitled to access complaints at that instant. The right of access is qualified, and access may be delayed if the restrictions on access satisfy constitutional scrutiny under the second step of the *Press-Enterprise II* analytical framework. *See Press-Enterprise II*, 478 U.S. at 9; *see infra* Section III.C. At this juncture, however, the New Mexico Courts may not raise their interests in judicial administration to argue that the right of access attaches at a later point in time.

### b. "Logic" Prong

As to the "logic" prong of *Press-Enterprise II*, the New Mexico Courts maintain that "[t]he purposes of public discussion and debate and the scrutiny of judicial proceedings are not served by providing access to complaints awaiting acceptance or rejection," and "[i]n fact, providing access to complaints that may be rejected or withdrawn only invites confusion as to what is happening in a state's courts." Aplt. Br. at 34–35.

40

Contrary to the New Mexico Courts' assertions, their position that the right of access attaches to complaints only *after* clerks have completed their review is directly at odds with the principles underlying the First Amendment access right. As an initial matter, the New Mexico Courts do not dispute that public access to complaints plays a significant, positive role in the functioning of the judicial process. Instead, they assert that the interests supporting public access to judicial proceedings do not depend "on whether access is provided to a newly-filed civil complaint before or after it is accepted by a court clerk," because "[e]ither way, the public can learn of new judicial proceedings, can scrutinize those proceedings to ensure their integrity, and can track and participate [in] the proceedings as they desire." Aplt. Br. at 34.

However, the New Mexico Courts' argument "ignores the immediate consequences precipitated by filing a complaint," *Schaefer*, 2 F.4th at 327, which originate not from a clerk's administrative acceptance of a complaint, but rather from the filer's submission of the complaint to the court. As the Fourth Circuit noted in *Schaefer*:

> [A] complaint instantaneously invokes a court's jurisdiction, and jurisdictional questions often implicate the public's confidence in judicial power. Moreover, a complaint carries significant implications for the parties' substantive legal rights and duties, by, among other things, triggering an obligation to preserve evidence and, in some cases, triggering a statute of limitations. This is especially true given that some complaints are withdrawn or cause the parties to settle before any judicial action is taken. The press and public thus have an important interest in reasonably contemporaneous access to civil complaints.

*Id.* at 328 (internal quotation marks and citations omitted). Moreover, "the public must promptly understand" these consequences triggered by the filing of a complaint

41

"if it is to help 'improve the quality of [the judicial] system by subjecting it to the cleansing effects of exposure and public accountability.'" *Id.* at 327 (quoting *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 587 (1976) (Brennan, J., concurring)).

Although the New Mexico Courts contend that "providing access to complaints that may be rejected or withdrawn only invites confusion as to what is happening in a state's courts," this position contradicts the case law pertaining to the right of access. Aplt. Br. at 35. For example, even if a civil complaint is withdrawn because it might have "prompt[ed] the parties to settle," "[t]he public still has a right to know that the filing of the complaint in our courts influenced the settlement of the dispute." *Planet III*, 947 F.3d at 592–93. "When a complaint is filed, and the authority of the people of the United States is thereby invoked, even if only as a threat to induce settlement, the American people have a right to know that the plaintiff has invoked their power to achieve his personal ends." *Id.* at 593 (internal quotation marks omitted) (quoting *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, No. 14-CV-6867 (VEC), 2016 WL 1071107, at *9 (S.D.N.Y. Mar. 18, 2016), *aff'd*, 814 F.3d 132). The New Mexico Courts' argument, therefore, overlooks the fact that the withdrawal or rejection of a complaint might itself be a matter of public interest that the press deems newsworthy. *See Planet I*, 750 F.3d at 787–88 ("The purpose of [Courthouse News'] effort to timely access filed unlimited civil complaints is to report on whatever newsworthy content they contain, and [Courthouse News] cannot report on complaints the [court] withholds.").

Moreover, the New Mexico Courts fail to appreciate that "a necessary corollary of the right to access is a right to *timely* access." *Planet III*, 947 F.3d at 594 (emphasis added). The New Mexico Courts' assertion that the press would not be harmed by waiting to access complaints until after processing, because "[e]ither way, the public can learn of new judicial proceedings," Aplt. Br. at 34, squarely contradicts the purpose of the right to timely access. Timeliness is not only an essential component of the right to access, but it is also an essential component of a journalist's line of work. "'[O]ld' news is not worthy of, and does not receive, much public attention." *Planet III*, 947 F.3d at 594. Additionally, "the need for immediacy of reporting news is even more vital in the digital age, where timeliness is measured in terms of minutes or seconds." *Id.* (internal quotation marks omitted). If the right to timely access did not attach until *after* court staff completed their administrative review—no matter how long this process was delayed—the purposes underlying the right to timely access would be undermined.

Thus, in sum, the district court did not err in concluding that the qualified right of timely access attaches when a complaint is submitted to the court.

## C. The District Court's Five-Business-Hour Rule

The district court's preliminary injunction enjoins the New Mexico Courts from withholding press or public access to newly filed, non-confidential civil complaints for longer than five business hours. In their third and final issue on appeal, the New Mexico Courts argue that the district court erred by imposing a bright-line, five-business-hour rule that does not accommodate for extraordinary

43

circumstances.  Specifically, the New Mexico Courts argue that "[b]ecause restrictions on the timing of access to court records entail qualified rights, subject to a balancing test considering a [s]tate's interest in the fair and orderly administration of justice, any order directing the release of court records must provide some accommodation for exceptional circumstances."  Aplt. Br. at 36.  "Otherwise," the New Mexico Courts contend, they have "no opportunity to ensure [their] judicial administration interests in emergencies or other extreme events," *id.* at 36.  We agree.

As we have previously noted, if a qualified right of access has been established, the court then proceeds to "step two" of the *Press-Enterprise II* analytical framework to determine whether the restrictions on this right of access satisfy constitutional scrutiny.  Here, after concluding that Courthouse News had a qualified right of access to newly filed, non-confidential civil complaints, the district court imposed a limitation on the timing of access to these complaints—namely, it concluded that the New Mexico Courts may delay access to the complaints by no more than five business hours.  Accordingly, we now turn to the second step of *Press-Enterprise II* to assess whether the district court's five-business-hour rule survives constitutional scrutiny.

Once we have determined that a qualified First Amendment right of access exists, "a presumption of access arises under *Press-Enterprise II* that may be restricted only if 'closure is essential to preserve higher values and is narrowly tailored to serve those interests.'"  *Planet III*, 947 F.3d at 594–95 (quoting *Press-Enter. Co. v. Superior Ct.*, 464 U.S. 501, 510 (1984)).  This second step of the

*Press-Enterprise II* framework involves a balancing test that weighs the qualified right of access against the interests asserted by the party seeking to restrict access. *See Press-Enterprise II*, 478 U.S. at 9.  In *Planet III*, for example, the Ninth Circuit addressed a similar case involving Courthouse News' challenge to the delayed access of newly filed, civil complaints; in that case, the state court asserted an interest in "the fair and orderly administration of justice."  947 F.3d at 596.  The Ninth Circuit framed the second step of the *Press-Enterprise II* test as follows: "To survive *Press-Enterprise II*'s two-prong balancing test," the state court must demonstrate that (1) "there is a 'substantial probability' that its interest in the fair and orderly administration of justice would be impaired by immediate access"; and (2) "no reasonable alternatives exist to 'adequately protect' that government interest."  *Id.* (quoting *Press-Enterprise II*, 478 U.S. at 14).  This balancing test aims to protect the press and the public's interest in accessing court documents in a timely manner, while still accommodating the state's interest in the fair and orderly administration of its courts.

The *Press-Enterprise II* balancing test applies "rigorous," but not strict, scrutiny.  *Id.*  This is because "limitations on the right of access that resemble 'time, place, and manner' restrictions on protected speech, would not be subjected to such strict scrutiny."  *Globe Newspaper Co.*, 457 U.S. at 607 n.17 (citation omitted) (quoting *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 63 n.18 (1976)).  In this case, the New Mexico Courts' access policies resemble time, place, and manner restrictions, as "they are content-neutral and affect only the timing of access to the

newly filed complaints." *Planet III*, 947 F.3d at 595.  Under the "rigorous" scrutiny standard, restrictions "that result in incidental delays in access are constitutionally permitted where they are content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." *Id.* at 585.

Here, the New Mexico Courts assert that the district court's preliminary injunction does not accommodate state interests as required by "step two" of the *Press-Enterprise II* analytical framework.  Specifically, the New Mexico Courts maintain that they have an "interest in ensuring efficient administration of the court and accuracy of court records," and this interest "would be severely impacted should a pleading be released to the press only to be withdrawn, redacted, sealed, or amended prior to acceptance."  Aplt. Br. at 37.  Because the district court's preliminary injunction lacks "any exception or 'substantial compliance' element," the New Mexico Courts contend that they will not have the opportunity to ensure the orderly administration of justice in extraordinary circumstances.  *Id.* at 38.

Although the district court briefly acknowledged the New Mexico Courts' judicial administration interests, it neither addressed these interests in a meaningful manner, nor accommodated them with any specific provisions in the preliminary injunction.  *See* Aplt. App., Vol. III at 778 ("[T]he Court acknowledges that New Mexico's interest in processing complaints falls within its interest in the 'fair and orderly administration of justice,' but concludes that such an interest does not extend beyond processing the complaint for longer than five business hours." (quoting

46

*Planet III*, 947 F.3d at 596)).  The district court's five-business-hour rule, without any exceptions, pays no regard to the New Mexico Courts' administrative limitations in extraordinary circumstances.  *Cf. Schaefer*, 2 F.4th at 323, 328 (affirming district court's determination that newly filed civil complaints must be made "available on the same day of filing when practicable, and where not practicable by the end of the next court day," while "fully exempt[ing] inconsequential delays and those caused by extraordinary circumstances").

The New Mexico Courts raise valid concerns regarding their ability to ensure the orderly administration of justice in extraordinary circumstances.  First, the New Mexico Courts assert that "some New Mexico judicial districts have far fewer clerical staff who must process each pleading, including criminal, family, civil, and sequestered cases," and "[i]n situations where a clerk cannot come to the court—as a result of sickness or weather, perhaps—pleadings cannot be processed as quickly as they might be otherwise, or at all, in some jurisdictions."  Aplt. Br. at 37–38.  Second, the New Mexico Courts point out that "certain criminal documents must take priority over civil complaints in those districts that do not have a designated civil department and where all incoming pleadings are processed by the same clerical staff."  *Id.* at 38.  Third and finally, the New Mexico Courts correctly note that the district court imposed its five-business-hour rule on all of New Mexico's district and magistrate courts—regardless of the court's size, staffing, and geographical location—without considering the different resources that each court has at its disposal.  As a result of the broad statewide application of the district court's

preliminary injunction, the New Mexico Courts face an even greater risk that they will be unable to protect their interests in orderly judicial administration when extraordinary circumstances arise.[10]

Moreover, the district court's failure to include an exception for extraordinary circumstances or substantial compliance is also inconsistent with our sister circuits' rulings regarding the right to timely access. Both the Fourth and Ninth Circuits have established timeliness requirements to protect Courthouse News' First Amendment right of timely access to newly filed civil complaints. *See Schaefer*, 2. F.4th at 328; *Planet III*, 947 F.3d at 587. In doing so, these courts observed that the right of timely access does not entitle the press to "immediate, pre-processing access to newly filed complaints." *Planet III*, 947 F.3d at 584. Rather, the right of timely access is a "flexible standard" that "does not require perfect or instantaneous access." *Schaefer*, 2 F.4th at 328.

In *Schaefer*, the Fourth Circuit concluded that the right of timely access "requires courts to make newly filed civil complaints available as expeditiously as possible." *Id.* at 329. Specifically, the Fourth Circuit affirmed the district court's grant of a declaratory judgment, which concluded that the clerks "must make newly

---

[10] The broad statewide application of the district court's preliminary injunction distinguishes it from other courts' rulings in similar cases. When other courts have granted relief to Courthouse News, they only set timeliness requirements for one or two county courts. *See Schaefer*, 2. F.4th at 322 (addressing Prince William County and the City of Norfolk in Virginia); *Planet III*, 947 F.3d at 586 (addressing Ventura County, California). Here, however, the district court's preliminary injunction affects New Mexico's courts *statewide* and applies across thirteen judicial districts, which are, in turn, comprised of thirty-three counties. Aplt. App., Vol. II at 319–21.

filed civil complaints available on the same day of filing when practicable, and where not practicable by the end of the next court day." *Id.* at 323. The Fourth Circuit explained that this standard "provides courts with some leeway where same-day access would be impracticable, and fully exempts inconsequential delays and those caused by extraordinary circumstances." *Id.* at 328 ("This flexibility accords with precedent in recognizing that the Constitution does not require the impossible."). Additionally, the Fourth Circuit reasoned that such delays in access were "content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice."[11] *Id.* (quoting *Planet III*, 947 F.3d at 585).

In *Planet III*, the Ninth Circuit held that the state court's policy of scanning complaints and making them available on public computer terminals in the clerk's office survived constitutional scrutiny, even though the policy did not result in perfect, same-day access. 947 F.3d at 598–600. Although this policy resulted in an

---

[11] Notably, the Fourth Circuit did not apply the Ninth Circuit's articulation of the *Press-Enterprise II* balancing test to determine the constitutionality of the access delays at issue in *Schaefer*. 2 F.4th at 328. However, the Fourth Circuit agreed with the Ninth Circuit that "[t]he [c]lerks' practices do indeed resemble time, place, and manner restrictions," and it therefore applied "more relaxed scrutiny," rather than strict scrutiny. *Id.* (citing *Planet III*, 947 F.3d at 595). Specifically, the Fourth Circuit stated that this level of scrutiny "requires that delays in access be 'content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice.'" *Id.* (quoting *Planet III*, 947 F.3d at 585). Therefore, the Fourth and Ninth Circuits appear to agree that, to determine the constitutionality of access delays, we apply a "more relaxed" or "rigorous" scrutiny (as opposed to strict scrutiny), and we consider a state's interest in the fair and orderly administration of justice.

"overnight delay in access to complaints filed during the last ninety minutes of the court's public hours," the Ninth Circuit reasoned that this delay "was no greater than essential to manage necessary court operations under the circumstances existing at the time"—namely, "severe budget constraints" that were limiting the state court's resources. *Id.* at 599–600. Additionally, the Ninth Circuit considered the fact that the state court subsequently updated its scanning policy once it was able to do so. *Id.* at 599. Specifically, the Ninth Circuit noted that these changes resulted in "'near perfect' same-day access," even though the revised policy reduced the hours in which complaints could be filed. *Id.* Like the Fourth Circuit in *Schaefer*, the Ninth Circuit reasoned that the state court's asserted interest "to justify the delay in access [was] core to its functioning as a court: the fair and orderly administration of justice." *Id.* at 596.

Although the courts in *Schaefer* and *Planet III* carefully balanced the qualified right of access with the state courts' asserted interests in the fair and orderly administration of justice, here, the district court concluded that the New Mexico Courts "will be able to meet [the five-business-hour] test without impairing their interests." Aplt. App., Vol. III at 778–79. In doing so, the district court relied on the New Mexico Courts' "data showing that their average processing time for initial filings was 8.82 hours, not taking into account whether the complaint was filed after hours." *Id.* Additionally, the district court reasoned that its five-business-hour rule "leaves some limited room for courts to delay access when 'same-day access would be impracticable,'" because "[a]s the day gets later, it may be more difficult" to make

50

complaints available "to the press on that same day." *Id.* at 773 (quoting *Schaefer*, 2 F.4th at 328). However, the district court's analysis does not address the New Mexico Courts' specific asserted interests in the fair and orderly administration of new case filings, especially in extraordinary circumstances where the five-business-hour rule cannot reasonably be met.[12]

Moreover, the district court misapplied "step two" of the *Press-Enterprise II* framework by focusing its analysis on historical access. The district court grounded its five-business-hour rule in the press's historical access to new civil complaints in New Mexico, and it reasoned that this standard "comes closest to the traditional right of access that the press had to civil complaints" prior to electronic filing. *Id.* at 776 (noting that its standard "takes into account" the fact that, historically, "most complaints filed in the morning would be available to the press at the end of the business day," but also "the reality that complaints filed later in the day would be available only the next morning"). Although historical practices are relevant to "step one" of *Press-Enterprise II*—which uses the "experience and logic" test to determine whether a qualified right of access attaches to newly filed civil complaints—such

---

[12] Although the district court briefly acknowledged the Fourth Circuit's holding regarding extraordinary circumstances and substantial compliance, the district court did so only in dicta. *See* Aplt. App., Vol. III at 775 ("While the Court agrees with the Fourth Circuit that neither 'inconsequential delays' nor delays caused by 'extraordinary circumstances' infringe the qualified right of access, the clerk cannot use bureaucratic rules or policies to justify delaying access to most complaints." (quoting *Schaefer*, 2 F.4th at 328)). The district court ultimately failed to include any provisions regarding extraordinary circumstances or substantial compliance in its bright-line ruling setting "the outer limit" of timely access at "five business hours between the submission and acceptance of a complaint." *Id.* at 783.

historical practices cannot justify a court's *current* policies or procedures that result in delayed access.  Rather, "step two" of the *Press-Enterprise II* framework considers the state's present interest in the fair and orderly administration of justice before determining whether the restrictions on access satisfy constitutional scrutiny.  *See Planet III*, 947 F.3d at 596.

We conclude the district court's preliminary injunction does not accommodate the New Mexico Courts' judicial administration interests in extraordinary circumstances where the five-business-hour rule cannot reasonably be met.  Therefore, we vacate the preliminary injunction and remand this case to the district court for further proceedings consistent with this opinion.  On remand, the district court must modify the preliminary injunction to accommodate for extraordinary circumstances or a substantial-compliance standard, in accordance with "step two" of *Press-Enterprise II*.[13]

---

[13] Notably, Courthouse News agrees that, on remand, the district court should apply the *Press-Enterprise II* balancing test "without inserting a bright-line five-hour rule."  Aple. Br. at 50.  In doing so, however, Courthouse News raises two arguments that are beyond the scope of the New Mexico Courts' appeal, and, therefore, not properly before this court.  First, Courthouse News contends that the district court erred in allowing the New Mexico Courts "to withhold access to new civil complaints . . . until the day after they are filed, despite the availability of less restrictive alternatives" that could provide "timely, contemporaneous access to new complaints."  *Id.* at 47–48.  Second, Courthouse News argues that the district court erred in modifying the Ninth Circuit's articulation of the *Press-Enterprise II* balancing test, and that, on remand, the district court should instead apply the Ninth Circuit's unmodified articulation of the test that it applied in *Planet III*.  *Id.* at 49–50; *see* Aplt. App., Vol. III at 777 (the district court "refram[ing]" the Ninth Circuit's articulation of the *Press-Enterprise II* balancing test to reflect its view that timely access is five business-hours between the submission and acceptance of complaints).

## IV.    Conclusion

For the foregoing reasons, we AFFIRM IN PART and REVERSE IN PART

the district court's memorandum opinion and order.  Specifically, we AFFIRM the

district court's conclusions that (1) *Younger* and *O'Shea* abstention do not apply, and

(2) the First Amendment qualified right of access of Courthouse News attaches when

a complaint is submitted to the court.  However, we conclude that the district court

erred in imposing a bright-line, five-business-hour rule that fails to accommodate the

state's interests in the fair and orderly administration of its courts.  Accordingly, we

REVERSE the district court's entry of a preliminary injunction, VACATE the

preliminary injunction, and REMAND this case to the district court for further

proceedings consistent with this opinion.

---

To the extent Courthouse News is seeking to modify the preliminary injunction or appeal its denial in part, these requests are not properly before this court because Courthouse News did not file a cross appeal.  *See Fedor v. United Healthcare, Inc.*, 976 F.3d 1100, 1107 (10th Cir. 2020) ("While an appellee can generally seek affirmance on any ground found in the record, it must file a cross-appeal if it seeks to enlarge its rights and gain 'more than it obtained by the lower-court judgment.'" (quoting *United States v. Madrid*, 633 F.3d 1222, 1225 (10th Cir. 2011))).